Qusair Mohamedbhai
Felipe Bohnet-Gomez*
Omeed Azmoudeh*

RATHOD | MOHAMEDBHAI LLC

2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
qm@rmlawyers.com
fbg@rmlawyers.com
oa@rmlawyers.com

*Attorneys for Plaintiff*

* Admission Pro Hac Vice Pending



FILED

4:30 pm, 1/18/22

**Margaret Botkins
Clerk of Court**

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| Plaintiff, | ) |
| | ) |
| JAMIN JOHNSON, an individual, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| Defendant, | ) |
| | ) |
| CHRISTIAN HANDLEY, | ) |
| in his individual capacity. | ) |

## COMPLAINT AND JURY DEMAND

Plaintiff Jamin Johnson, by and through his attorneys Qusair Mohamedbhai, Felipe Bohnet-Gomez, and Omeed Azmoudeh of RATHOD | MOHAMEDBHAI LLC, hereby alleges as follows:

### INTRODUCTION

1.  From 2007 to 2017, Plaintiff Jamin Johnson dedicated his life to law enforcement and the Albany County Sheriff's Office ("ACSO"). During that time, Defendant Christian Handley, Mr. Johnson's supervisor, relentlessly demeaned Mr. Johnson with racial slurs and innuendos, even once in front of Mr. Johnson's wife and children. The total of Mr. Handley's racism, bigotry, and discrimination in the workplace almost defies belief.

2.  Ultimately, towards the end of 2016, Mr. Handley was promoted to Patrol Sergeant and immediately orchestrated a sham disciplinary process to force Mr. Johnson out of the ACSO because of his race. To do so, Mr. Handley fabricated numerous disciplinary actions against Mr. Johnson in rapid succession. He then relied on these disciplinary actions, entirely born of racism,

2

to persuade the ACSO to give Mr. Johnson an ultimatum: Mr. Johnson could demote himself to a position still under Mr. Handley's direct supervision and control or leave the ACSO.

3. On August 2, 2017, Mr. Johnson took the only tenable option and resigned. It was abundantly clear that continuing to work for Mr. Handley would have meant enduring more racism, more bigotry, and more discrimination, none of which was tolerable.

4. In 2021, four years after Mr. Johnson's removal, the ACSO conducted an internal investigation which substantiated Mr. Handley's racism and bigotry and also revealed that Mr. Handley had been emboldened to engage his misconduct by having received blatantly unfair preferential treatment throughout his employment (*e.g.*, Mr. Handley had received written exams and interview questions prior to testing for his promotions). Upon information and belief, the investigation very likely reveals several other categories of Mr. Handley's wrongdoing aside from racism and preferential treatment.

5. Mr. Johnson now seeks redress for the Mr. Handley's unlawful and unconstitutional conduct, which is well-established by the ACSO's own investigation.

## JURISDICTION, VENUE, AND PARTIES

6. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Mr. Johnson's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

7. Venue is proper in the District of Wyoming pursuant to 28 U.S.C § 1391(b). All of the events and omissions alleged herein occurred within the state of Wyoming. At the time of the events and omissions giving rise to this litigation, Mr. Handley resided in Wyoming.

8. At all times relevant hereto, Mr. Johnson was a citizen of the United States and a resident of the State of Wyoming.

9. At all times relevant hereto, Mr. Handley was a citizen of the United States, a resident of the State of Wyoming, and was acting under color of state law in his capacity as a law enforcement officer employed by the ACSO.

## FACTUAL ALLEGATIONS

### Jamin Johnson's Dedication to the Albany County Community and Beyond

10. Mr. Johnson was born in Albany County, grew up there, met his wife there, and decided to spend his life dedicating himself to the advancement and betterment of its community.

11. He chose this path having watched his father, Anthony Johnson, perform decades of service as a University of Wyoming Police Officer. He learned from observing his father's career that law enforcement was a lifestyle, a sacrifice, a noble endeavor, and a family legacy that he wanted to carry on. In fact, Mr. Johnson's twin brother and two of his cousins also chose careers in law enforcement. Law enforcement was Mr. Johnson's dream job.

12. In 2006, he graduated from the University of Wyoming with a bachelor's degree in Early Childhood Education and Child Development.

13. In 2007, the ACSO hired Mr. Johnson as a Detention Deputy to work exclusively with inmates at the Albany County Detention Center. Mr. Johnson believed that the inmates had already experienced the worst moments of their lives and thus focused on giving them a positive experience in the hope that one day they could be released as productive members of society.

14. As he would continue to do throughout his career, Mr. Johnson received overwhelmingly positive performance evaluations as a Detention Deputy, highlighting his dedication to the work and respect for coworkers and inmates.

15. While Mr. Johnson worked nights at the detention center, he attended additional schooling during the day at the Western Governor's University and, in 2009, earned a master's degree in Community Health Education.

16. At the same time, Mr. Johnson also served as an intern in the ministry at a local church, where he helped educate the children of Albany County. This position also sent him on several mission trips, including to Louisiana and Mississippi following the aftermath of Hurricane Katrina and Rwanda in response to its long-standing humanitarian crisis.

17. All to say, Mr. Johnson set out on a clear path to help people. Unfortunately, his dedication to the community was met with racism and bigotry at the hands of Mr. Handley.

**Mr. Handley's Years-Long Racist Tirade**

18. While it took Mr. Johnson four years to be promoted to Patrol Deputy, Mr. Handley started as a Patrol Deputy immediately after being hired by the ACSO in or around 2011—this disparity was emblematic of the favoritism and favor that Mr. Handley would seek and frequently obtain in the coming years, despite the heinous conduct described herein.

19. Messrs. Johnson and Handley worked together as Patrol Deputies from 2011 to 2014, when Mr. Handley began to engage in overt and abhorrent racism against Mr. Johnson, the only Black officer at the ACSO.

20. During this time, Mr. Handley began routinely referring to Mr. Johnson as a "nigger" and a "jigaboo" and making these same comments about Black people in the community (including arrestees).

21. Despite the onerous racism, Mr. Johnson performed brilliantly as a Patrol Deputy. He received several positive performance evaluations which highlighted his dedication to the community, his respect, and his growth as an officer.

22. In 2014, Mr. Handley was promoted to Corporal and became Mr. Johnson's supervisor.

23. Mr. Handley's racism became even more blatant.

24. For example, Mr. Johnson once stopped several Black people in a vehicle. Mr. Handley arrived at the stop as the supervising officer only to ask, "What did these niggers do?" Comments like these were routine.

25. Mr. Johnson was eventually promoted to Corporal six months after Mr. Handley, despite having several more years of experience.

26. In 2016, Mr. Handley was again promoted, this time to Patrol Sergeant, and with even more supervisory authority over Mr. Johnson, Mr. Handley's racism grew even more appalling.

27. As Patrol Sergeant, Mr. Handley had the power to:

    a. control Mr. Johnson's schedule and assignments;

    b. review his reports and recommendations;

    c. conduct his performance evaluations;

    d. discipline him;

    e. manage his continuing education requirements;

    f. approve or reject his vacation requests;

    g. and make recommendations as to demotions, promotions, terminations, transfers, and other personnel decisions.

28. In June 2017, Messrs. Handley and Johnson walked into a common area at the ACSO, and Mr. Handley asked whether Mr. Johnson had ever had sex with a Black woman.

29. Taken aback, Mr. Johnson said nothing.

30. Mr. Handley followed up: "Because that would be nasty. That is like having sex with a dog."

31. Around the same time, in the briefing room, Mr. Handley was describing an arrest from the previous night of four Black students from the University of Wyoming: "I stopped a car full of niggers."

32. When he saw Mr. Johnson in the room, Mr. Handley offered a remarkable explanation: "you're not one of them, but some Black people are just niggers."

33. Around that same time, Mr. Johnson was walking out of his home with his wife and children when Mr. Handley drove by and yelled: "mother fucking nigger!"

34. Mr. Handley later apologized for having not realized that Mr. Johnson's family was present, as if his vile racism was otherwise acceptable.

35. Despite all of this, Mr. Handley had been climbing the ranks, had earned entrance into the ACSO's "old boys' club," and became a trusted voice in ACSO's personnel decisions.

**Mr. Handley's Sham Disciplinary Process Designed to Force Mr. Johnson's Resignation**

36. Prior to Mr. Handley's promotion to Patrol Sergeant, no ACSO supervisor had ever written up Mr. Johnson for any violation of policy that challenged his integrity or commitment to the community.

37. Mr. Johnson had received overwhelmingly positive performance evaluations and had on different occasions received praise directly from then-Sheriff David O'Malley for performing life-saving acts in dangerous situations.

38. It is without question that Mr. Johnson was a dedicated and qualified officer.

39. But once Mr. Handley became Patrol Sergeant, the hostile work environment that had included a steady barrage of dehumanizing comments and race-based harassment transformed into a sham disciplinary process designed to target Mr. Johnson and force him out of the ACSO.

40. Just weeks after his promotion to Patrol Sergeant, Mr. Handley wrote a performance evaluation that accused Mr. Johnson of engaging in several forms of misconduct over the previous year.

41. In other words, while Messrs. Handley and Johnson both worked as Corporals, Mr. Handley had apparently taken notes on Mr. Johnson's conduct and decided to unleash pent-up racism one week after becoming Mr. Johnson's supervisor.

42. ACSO policy permitted Mr. Johnston to submit a written rebuttal to the disciplinary charges brought by Mr. Handley.

43. But when Mr. Johnson consulted a colleague in drafting his rebuttal, Mr. Handley disciplined Mr. Johnson for insubordination and dissension.

44. Of course, consulting a colleague and drafting a formal rebuttal—as any reasonable employee would do, particularly when they had long suffered under Mr. Handley's abhorrent racism—should not have resulted in discipline. It became clear to Mr. Johnson that he was being targeted by Mr. Handley on the basis of race.

45. Indeed, Mr. Handley thereafter wrote several other sham disciplinary actions against Mr. Johnson in rapid succession, all designed to force his resignation.

46. Mr. Handley's write-ups accused Mr. Johnson of lying, creating elaborate stories to cover up his mistakes, and threatening his coworkers, to name just a few of the apparent "issues" in Mr. Johnson's behavior.

47. Mr. Johnson had never been accused of this type of misconduct until Mr. Handley took the reins, and Mr. Johnson was never given an opportunity to rebut Mr. Handley's utterly unsubstantiated allegations.

48. Nevertheless, based on his sham disciplinary actions, Mr. Handley persuaded Sheriff O'Malley to issue an ultimatum to Mr. Johnson: he could accept a suspension and demotion to Patrol Deputy or leave the ACSO.

49. The ACSO delivered this ultimatum to Mr. Johnson during an in-person meeting with Mr. Johnson (and his attorney) and through a letter dated July 31, 2017.

50. At no time during the meeting and nowhere in the letter is it even mentioned that Mr. Handley had been tormenting Mr. Johnson for years, and that the entire disciplinary process was suffused with Mr. Handley's racism.

51. If Mr. Johnson had decided to return as a Deputy, he would have continued to work under Mr. Handley, whose pernicious racism and discrimination had now received the stamp of approval from the ACSO.

52. Because working under those circumstances would have been intolerable, Mr. Johnson was compelled to resign on or around August 2, 2017.

**The ACSO's Internal Investigation into Mr. Handley**

53. In February of 2021, four years after Mr. Johnson's termination, Sheriff Appelhans, a Black Man, decided just after his appointment that the ACSO ought to look into Mr. Handley's conduct.

54. In conducting the investigation, the ACSO Human Resources Director, Christina Lewis, contacted Mr. Johnson and notified him that his name had come up several times in interviews with other employees.

55. In essence, several employees told Ms. Lewis that she should speak with Mr. Johnson because they had witnessed Mr. Handley's longstanding racism, bigotry, and discrimination towards Mr. Johnson.

56. Ms. Lewis scheduled a meeting with Mr. Johnson, to occur on or around February 5, 2021.

57. During the meeting, Mr. Johnson told Ms. Lewis of Mr. Handley's egregious acts, and Ms. Lewis admitted that Mr. Handley's racism was widespread and well-known, and that Mr. Handley had been emboldened to carry out this behavior having received preferential treatment as he climbed the ranks (*e.g.*, he received written exams and interview questions in advance of the interview process for Corporal and Patrol Sergeant).

58. Ms. Lewis concluded the meeting by saying something to the effect of: "I wish I had known what you had gone through at the time, and I wish there was something I could do to make things right, but it's in the past. . . ."

59. Upon information and belief, the investigative file and any subsequent report(s) similarly substantiates the vile and unforgivable racism carried out by Mr. Handley that ultimately forced Mr. Johnson out of his dream job and otherwise reveals additional, abhorrent categories of misconduct by Mr. Handley.

60. Upon information and belief, the ACSO terminated Mr. Handley following the investigation.

## **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1981, Brought Through 42 U.S.C. § 1983**
**Discrimination on the Basis of Race**

61. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

62. At all times relevant to this claim, Defendant Handley was acting under color of state law in his capacity as a law enforcement officer employed by the ACSO.

63. Plaintiff Johnson had a clearly established right under the law of the United States to the full and equal benefit of the laws, to equal employment opportunities, and to make and enforce contracts, absent racial discrimination.

64. At all times relevant to this claim, it was clearly established that supervisors could not interfere with an employee's right to the full and equal benefit of the laws, to equal employment opportunities, and to make and enforce contracts by discriminating against employees on the basis of race.

65. Any reasonable supervisor acting under the color of state law knew or should have known of these clearly established rights.

66. As described herein, Defendant Handley engaged in discriminatory conduct toward Mr. Johnson on the basis of his race—including a steady barrage of dehumanizing and racist comments, along with engaging in a sham disciplinary process designed to force Mr. Johnson's resignation—that was objectively unreasonable in light of the facts and circumstances confronting him, violating Plaintiff Johnson's rights to the full and equal benefit of the laws, to equal opportunities, and to make and enforce contracts.

67. Defendant Handley knew and intended that his discriminatory conduct would result in demotions, transfers, denials of promotional opportunities, special assignments, trainings, written reprimands, overly critical performance evaluations, reductions in pay, and denial of continued employment for Plaintiff Johnson.

68. Defendant Handley's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff Johnson's federally protected rights.

69. As a direct result of Defendant Handley's actions, Plaintiff Johnson has suffered economic and non-economic injuries in an amount to be proven at trial.

70. The acts or omissions of Defendant Handley directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and Plaintiff Johnson's attorneys' fees in bringing this action.

## SECOND CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment, Brought Through 42 U.S.C. § 1983
### Equal Protection – Race Discrimination

71. Plaintiff Johnson hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

72. Plaintiff brings claims for violation of equal protection under the Fourteenth Amendment to the United States Constitution through the remedies provided by 42 U.S.C. § 1983.

73. Plaintiff is Black and thus a member of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

74. Defendant Handley, at all relevant times hereto, was acting under the color of state law.

75. As described herein, Defendant Handley intentionally discriminated against Mr. Johnson on the basis of his race.

76. Purposeful racial discrimination by an individual acting under color of state law violates the Fourteenth Amendment and is therefore actionable under 42 U.S.C. § 1983.

77. Defendant Handley's discriminatory conduct violated clearly established rights belonging to Plaintiff Johnson of which reasonable governmental officials in his position knew or should have known.

78. Defendants Handley unlawfully denied Plaintiff Johnson the benefits, privileges, promotional opportunities, and terms and conditions of his employment due to his race.

79. The unconstitutional practices complained of above were done with malice or reckless indifference to Plaintiff Johnson's federally protected rights.

80. The acts or omissions of Defendant Handley directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and Plaintiff Johnson's attorneys' fees in bringing this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Johnson respectfully requests that this Court enter judgment in his favor and against Defendant Handley, and award him all relief as allowed by law, including but not limited to the following:

a. All declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages, including but not limited to back pay, font pay, and lost benefits, as established at trial;

c. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

e. Punitive damages for all claims as allowed by law, in an amount to be determined at trial;

f. Prejudgment and post-judgment interest at the highest lawful rate;

g. Attorneys' fees and costs; and

h. Such further relief as justice requires.

**PLAINTIFF REQUESTS A TRIAL TO JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 18th day of January 2022.

/s Qusair Mohamedbhai
Qusair Mohamedbhai
Felipe Bohnet-Gomez*
Omeed Azmoudeh*

RATHOD | MOHAMEDBHAI LLC

2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
qm@rmlawyers.com
fbg@rmlawyers.com
oa@rmlawyers.com

*Attorneys for Plaintiff*

* Admission Pro Hac Vice Pending